IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JILL N. DICKENS,

     Plaintiff,

v.                                                    CASE NO. 1:17-cv-189-MW-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits ("DIB") and supplemental

security income ("SSI") pursuant to Title II and Title XVI, respectively, of

the Social Security Act ("the Act"). (ECF No. 1.) The Commissioner has

answered, (ECF No. 10), and both parties have filed briefs outlining their

respective positions. (ECF Nos. 13–14.) For the reasons discussed below,

it is recommended that the Commissioner's decision should be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for Title II DIB and Title XVI benefits,

alleging a disability onset date of August 15, 2014. July 9, 2009. (R. 288, 292.) Plaintiff claims she cannot work due to depression, post-traumatic stress disorder ("PTSD"), anxiety, memory loss, spinal injuries, and rheumatoid arthritis. (R. 336.) Her applications were denied initially and upon reconsideration. (R. 10, 180, 184.) Following two administrative hearings on May 11, 2016, and December 20, 2016, an Administrative Law Judge ("ALJ") issued a written decision on January 13, 2017, finding Plaintiff not disabled. (R. 10–25, 39–108.) The Appeals Council thereafter denied Plaintiff's request for review. (R. 1–5.) Plaintiff subsequently appealed the ALJ's decision to this Court. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2012). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d

580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be

expected to last for a continuous period of not less than twelve months. 42

U.S.C. §§ 416(I), 423(d)(1) (2012); 20 C.F.R. §§ 404.1505, 416.905

(2015).[1] The impairment must be severe, making Plaintiff unable to do her

previous work, or any other substantial gainful activity which exists in the

national economy. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511,

416.905–416.911.

The ALJ must follow five steps in evaluating a claim of disability. 20

C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the

existence of a disability as defined by the Social Security Act. *Carnes v.

Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is

working at a substantial gainful activity, she is not disabled. §§

404.1520(b), 416.920(b). Second, if a claimant does not have any

impairment or combination of impairments which significantly limit her

physical or mental ability to do basic work activities, then she does not

have a severe impairment and is not disabled. §§ 404.1520(c), 416.920(c).

Third, if a claimant's impairments meet or equal an impairment listed in 20

---

[1] All further references to 20 C.F.R. will be to the 2015 version, unless otherwise specified.

C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. §§ 404.1520(d), 416.920(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. §§ 404.1520(e)–(f), 416.920(e)–(f). Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. §§ 404.1520(g), 416.920(g).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2]

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

## III.  SUMMARY OF THE RECORD

### A.    Medical Records

#### 1.    *Physical Health*

Plaintiff was admitted to the emergency room in March 2013 with a large area of cellulitis after injecting recreational drugs. (R. 548–49.) An echocardiogram and chest x-rays were normal. Plaintiff responded well to treatment with clindamycin and vancomycin and discharged.

Subsequent physical examinations in September 2013 and April 2014 found Plaintiff to have a normal range of motion, normal muscle strength, and stability in all joints. (R. 497, 503.)

Plaintiff then presented to Regional General Rural Health Clinic ("RGRHC") in May 2014 with right foot pain and swelling. (R. 596.) Physical examination was normal except for swelling and erythema in her right foot. X-rays revealed no fracture or dislocation. (R. 594–95.) Plaintiff was diagnosed with acute gouty arthritis and prescribed indomethacin for pain. (R. 586.)

Plaintiff returned to RGRHC in August 2014 after being hit by a truck at low speed. (R. 624.) She had pain her neck and both wrists. A CT scan of her head revealed no mass, hemorrhage, or infarct. (R. 621.) CT scans

of her chest and cervical spine were also negative. (R. 622–23.) She was assessed with a cervical and thoracic spine strain, prescribed a soft collar, naproxen, flexeril, and tramadol, and discharged in stable condition. (R. 615, 625.)

Plaintiff thereafter began treating with Joseph P. Cardello, Jr., D.C., at Gainesville Injury and Rehabilitation Center. (R. 635–38.) At her initial examination in August 2014, Plaintiff displayed labored movement during the exam and while entering and leaving the office. She did not, however, require assistance with her gait. Examination revealed tenderness, spasms, and restricted range of motion in her cervical spine, thoracic spine, lumbar spine, right shoulder, and left knee. X-rays revealed possible cervical ligament damage, pelvic unleveling with left leg deficiency, and borderline shoulder dislocation, but otherwise no fracture, dislocation, or malignancy. Dr. Cardello assessed Plaintiff with post-traumatic pain, cerevicocranial syndrome, and cervical, thoracic, lumbar, right shoulder, and left knee sprains.

Plaintiff continued treating with Dr. Cardello through February 2015. (R. 639–71.) In November 2014, Plaintiff stated that her neck, shoulder, left knee, and middle back pain were improving. (R. 632.) She continued to

experience headaches, however, and lower back pain that radiated into her legs. She also still had tenderness and muscle spasms and restricted range of motion in her lumbar spine, cervical spine, and right shoulder.

Plaintiff also treated with Medical Injury Rehabilitation Specialists from August 2014 through February 2015 following her August 2014 accident. (R. 691–714.) Initial examination revealed an antalgic gait, limited cervical and lumbar range of motion due to pain, and tenderness to palpation in her lumbar and cervical spine. (R. 713) Plaintiff was provided ongoing conservative treatment, including dilaudid and lortab for continued reports of pain in her neck and back. (R. 691–714.)

A cervical MRI in October 2014 revealed reversal of the normal cervical lordosis, C3 posterior central disc herniation, and C4 right paracentral disc herniation causing right neural foraminal narrowing. (R. 633.)

Plaintiff eventually returned to RGRHC in December 2014 with complaints of muscular chest pain. (R. 598.) Physical examination was normal and imaging revealed no acute process in the chest. (R. 599, 606.) Plaintiff was assessed with chest wall pain and prescribed flexeril and meloxicam. (R. 600.)

In July 2015 Plaintiff's extremities were noted to be "grossly normal"

upon examination. (R. 723.) The following month Plaintiff presented for a

consultative examination with Lance Chodosh, M.D.. (R. 728–35.) Plaintiff

reported being able to perform activities of daily living without assistance

but claimed that she cannot walk or stand extensively or sit comfortably for

more than thirty minutes. On examination Plaintiff exhibited "very mild pain

behavior." There was no edema, cyanosis, clubbing, deformity, or

varicosity in her extremities and all joints had full range of motion. Plaintiff

had limited range of motion, however, in her cervical spine with rotation,

lumbar spine with flexion and extension. There was no deformity,

tenderness, or paraspinal muscular spasm in her back and straight leg

raise was negative while supine and sitting. Plaintiff's motor function was

grossly normal in all four extremities with 5/5 strength. Manual dexterity

was normal and Plaintiff had good coordination. Standing balance and gait

was normal and Plaintiff could heel to toe walk and squat and rise.

Plaintiff then began treating with Anuj Sharma, D.O., at Sharma

Institute of Pain Medicine and Rehabilitation in August 2015. (R. 746–52.)

Plaintiff reported symptoms of anxiety and depression but no suicidal

thoughts. She complained of lower back and neck pain with radicular

symptoms and spasms. Plaintiff admitted, however, that medication and yoga makes the pain better. (R. 750.) She also noted that her hobbies included reading and swimming. (R. 751.)

On examination Plaintiff appeared to be in no acute distress. There was no edema, swelling, or lymphedema in her extremities. Although she had an antalgic gait she walked independently. Plaintiff had tightness and tenderness on palpation to her cervical and lumbar paraspinal muscles. Range of motion was restricted in her cervical and lumbar spine. Knee, hip, ankle, wrist, and elbow range of motions, however, were normal. Plaintiff had symmetric deep tendon reflexes, intact motor skills, and 5/5 muscle strength in all extremities. Seated leg raise, however, was positive on both legs. Dr. Sharma instructed Plaintiff to begin a home exercise program daily and prescribed Plaintiff hydrocodone for pain management. He also ordered a urine drug screen per Florida regulations.

Plaintiff returned for a follow-up with Dr. Sharma in September 2015. (R. 758–62.) Plaintiff reported decreased pain due to treatment. She still had symptoms of anxiety but no depression or suicidal thoughts. There was no edema, swelling, or lymphedema in her extremities. Although she had an antalgic gait she walked independently. Plaintiff had tightness and tenderness on palpation to her cervical and lumbar paraspinal muscles.

Range of motion was labored in her cervical and lumbar spine. Knee, hip, ankle, wrist, and elbow range of motions, however, were normal. Plaintiff had symmetric deep tendon reflexes, intact motor skills, and 5/5 muscle strength in all extremities. Seated leg raise, however, was positive on both legs. Dr. Sharma recommended that Plaintiff participate in a daily stretching program, ordered another urine drug screen per Florida regulations, and refilled Plaintiff's hydrocodone prescription.

When Plaintiff returned for her follow-up appointment with Dr. Sharma in October 2015, her prior urine drug screen showed hydrocodone with no metabolites, which inferred that Plaintiff dropped a tablet of hydrocodone into her urine cup, in violation of her contract. (R. 858–62.) Dr. Sharma therefore weaned and discontinued hydrocodone and discharged Plaintiff due to non-compliance.

Plaintiff began treating with Mark Sacher, D.O., at Total Patient Care of Ocala in January 2016. (R. 881–86.) Although Plaintiff appeared to be in moderate distress she ambulated normally. Plaintiff had right shoulder pain on palpation and tenderness in her left elbow. Subsequent imaging of Plaintiff's elbow and right shoulder revealed no acute osseous abnormalities. (R. 887–88, 924, 926.) Her upper extremities were

otherwise normal, including range of motion and motor strength. (R. 881–86.) Lower extremity examination was normal. Plaintiff's neck was tender and painful with motion. She also had tenderness on palpation in her cervical spine and lumbar spine, but no tenderness in her thoracic spine. Cervical, lumbar, and thoracic ranges of motion were "complete with age," and there were no spasms. Plaintiff also had normal deep tendon reflexes and straight leg raises were negative.

Dr. Sacher assessed Plaintiff with headaches, degeneration of lumbar intervertebral disc, arthropathy of lumbar facet joint, cervical disc prolapse with radiculopathy, spinal stenosis in cervical region, shoulder pain, pain in elbow, musculoskeletal disorder of the neck, and low back pain. Dr. Sacher prescribed Plaintiff with norco, lyrica, and mobic, and instructed Plaintiff to exercise daily. Dr. Sacher also counseled Plaintiff on the importance of smoking cessation, as it is "important in the treatment and prevention of chronic pain."

At Plaintiff's next appointment with Dr. Sacher in February 2016, Plaintiff continued to report right shoulder and left elbow pain, and worsening cervical and lumbar pain. (R. 876–81.) Examination findings were the same as the prior month. Dr. Sacher increased Plaintiff's dilaudid,

Ibuprofen, and lyrica prescriptions and instructed Plaintiff to exercise daily.

By March 2016, Plaintiff's pain had not improved so Dr. Sacher continued

her dilaudid, mobic, and lyrica prescriptions and continued encouraging

Plaintiff to exercise daily. (R. 871–75.) Plaintiff's pain worsened by April

2016, so Dr. Sacher increased Plaintiff's dilaudid prescription, continued

her meloxicam prescription, and encouraged Plaintiff to exercise. (R.

864–70.)

## 2.    *Mental Health*

Plaintiff has a history of major depressive disorder, panic disorder,

and PTSD. (R. 437.) In August 2015, Plaintiff presented for a psychological

evaluation with Carmen Tozzo-Julian, Ph.D. (R. 737–40.)  Plaintiff told Dr.

Tozzo-Julian that she had racing thoughts, decreased ability to

concentrate, irritability, decreased need for sleep, anger outbursts,

apprehension, an increased startle response, nightmares, and a history of

panic attacks. She denied a history of suicidal ideation. Plaintiff also denied

a history of alcohol but admitted to using marijuana in the past, as well as

smoking one pack of cigarettes per day for the past thirty years. Plaintiff

reported being able to shower and dress independently and complete

some household chores.

On examination, Plaintiff's motor behavior and eye contact were normal. Although her speech was pressured, her expressive and receptive language were within the average range. She had difficulty organizing responses to questions but her thoughts were tangential and her attention average. Plaintiff was alert and oriented to time, place, and person. Her memory functions, however, were mildly impaired. Although she could name the current and previous presidents and remember three of three words immediately after presentation, she could only remember two of the three words several minutes after presentation. Plaintiff's verbal reasoning skills were in the average range and her intelligence also appeared in the average range. Dr. Tozzo-Julian diagnosed Plaintiff with bipolar I disorder, major depressive disorder, and moderate generalized anxiety disorder.

At her initial appointment with Dr. Sacher in January 2016, Dr. Sacher noted that Plaintiff's insight, judgment, mood, orientation, and memory appeared normal. (R. 885.) He nevertheless assessed Plaintiff with chronic PTSD, chronic anxiety, and major depressive disorder.

Plaintiff then presented for a psychiatric evaluation with Umesh M. Mhatre, M.D., in June 2016. (R. 898–901.) Plaintiff reported being molested when she was nine years old, sexually assaulted when she was sixteen, and that she endured emotional abuse for most of her life. Plaintiff

also reported symptoms of anxiety, crying spells, shortness of breath, chest pain, staring spells, and insomnia. During a typical day Plaintiff wakes up, drinks coffee, takes her medication, and then does some housework, such as washing dishes, sweeping, vacuuming, moping, laundry, and cleaning the bathroom. She has to take breaks to rest or lay down in between chores until her pain subsides. She cleans the kitchen after dinner, then watches television and goes to bed.

On examination, Plaintiff appeared emotionally distraught. There was no evidence, however, of any physical distress. Her cognition was intact for orientation to time, place, and person. Her memory was also intact for immediate, recent, and remote events. There was no evidence to auditory or visual hallucinations, perceptual deficits, or psychosis. There was also no sign of pressured speech, flight of ideas, or thought blocking. Her insight and judgment, however, were questionable. Dr. Mhatre assessed Plaintiff with generalized anxiety disorder, major depressive disorder, personality disorder, and a GAF score of 70.

## B.    Opinion Evidence

### 1.    *Physical Health*

#### a.    Dr. Chodosh

In August 2015 Dr. Chodosh opined that Plaintiff could stand, walk,

sit, bend over at the waist, squat, kneel, lift, carry, handle objects, see, hear, and speak normally. (R. 735.) Dr. Chodosh further opined that Plaintiff had areas of chronic pain without physical signs of impairment, as well as significant mental health issues. Dr. Chodosh recommended a mental health assessment.

### b.   Dr. Harris

Walter Harris, M.D., a state agency physician, completed a physical residual functional capacity assessment for Plaintiff on October 22, 2015. (R. 151–54.) Dr. Harris opined that Plaintiff can occasionally lift and/or carry twenty pounds occasionally and ten pounds frequently. Plaintiff can stand and/or walk for a total of six hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. She can occasionally climb ladders, ropes, and scaffolds and frequently stoop and crawl. She has no limitations on climbing ramps and stairs, balancing, kneeling, and crouching. Plaintiff has no manipulative, visual, or communicative limitations. She must avoid concentrated exposure to hazards, but has no other environmental limitations.

### c.   Dr. Sacher

Dr. Sacher completed a Clinical Assessment of Pain for Plaintiff in

April 2016. (R. 889–93.) Dr. Sacher opined that a person with Plaintiff's diagnosis could be expected to experience pain. Plaintiff's pain was somatogenic, nociceptive, and continuous. Plaintiff also has a complex regional pain syndrome and complex pain syndrome. Dr. Sacher opined that Plaintiff had marked pain that interfered with concentration, persistence and pace, prevented Plaintiff from completing tasks relating to the activities of daily living without frequent interruptions for pain relief, and prevented Plaintiff from completing tasks at work without frequent breaks or interruptions for pain relief. Based on Plaintiff's pain, Dr. Sacher opined that Plaintiff had marked limitations in her ability to complete a normal worday and workweek without interruptions from pain and to perform at a consistent pace without an unreasonable number and length of rest periods. She only had mild limitations, however, in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and interact appropriately with the general public.

Dr. Sacher also completed a Residual Functional Capacity Evaluation for Plaintiff in April 2016. (R. 894–96.) Dr. Sacher opined that Plaintiff could sit for up to thirty minutes at a time, and only sit for a total of

one hour per day five days per week. Plaintiff could stand for up to thirty minutes at a time, and only stand for a total of one hour per day five days per week. Assuming Plaintiff could sit or stand at her will, Plaintiff could only work at a sit/stand job for a total of one hour per day five days per week. Plaintiff could, however, frequently lift up to five pounds.

### 2.   *Mental Health*

#### a.    Dr. Tozzo-Julian

In August 2015, Dr. Tozzo-Julian opined that Plaintiff's,

> [p]rognosis is guarded. Ms. Dickens reported moderate pain that limits her ability to stand, walk, and lift for extended periods of time. She will have difficulty producing quality work consistently because of chronic pain and anxiety. She is able to learn new tasks, if they are repetitive. She will have difficulty getting along with fellow workers and supervisors because of mood instability. She will have difficulty coping with changes in routine and job stress because of depression and anxiety.

(R. 740.) Dr. Tozzo-Julian recommended medication management, as well as individual therapy focusing on helping Plaintiff develop appropriate coping skills, identify and change negative thoughts, learn relaxation techniques, develop an exercise routine, and improve social supports. Dr. Tozzo-Julian further opined that Plaintiff would not be able to manage her finances because of mood swings and a history of poor judgment.

### b.    Dr. Mhatre

Dr. Mhatre completed a medical source statement of Plaintiff's ability to do work-related activities in June 2016. (R. 902–04.) Dr. Mhatre opined that Plaintiff's ability to understand, remember, and carry out instructions was not affected by her impairments. Her ability to interact appropriately with the public, supervisors, co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting was moderately restricted. Dr. Mhatre further opined that Plaintiff is competent to handle her own affairs and that her inability to work is a combination of physical and psychological problems. (R. 901.)

## C.    Hearing Testimony

At Plaintiff's first hearing on May 11, 2016, Plaintiff lived with her mother and eighteen year old son (R. 74–75.) She dropped out of school in middle school but then got her GED when she was eighteen years old. (R. 55.) Plaintiff never did any vocational rehabilitation, and although she tried going to college in 2004, she was unsuccessful. (R. 63–64.) Plaintiff smokes approximately ten cigarettes per day but does not drink alcohol. (R. 70.)

Plaintiff was on Medicaid prior to March 2016 when her son was

under eighteen. (R. 56–58.) When she had Medicaid she was seeing a primary care physician and a pain management specialist. (R. 66.) She only saw her primary care physician once every three months because she does not drive.  The insurance company, however, sent a car to take her to her pain management appointments every month (R. 66–67.) Once her son turned eighteen Plaintiff became ineligible for Medicaid and she cannot afford to pay for her own insurance. She was, however, going to look into patient assistance healthcare treatment through Shands. (R. 56–58.)

Plaintiff was an exotic dancer prior to a car accident in 2003. (R. 60.) She could lift her body weight and was on her feet for two hours or more in an average day (R. 62.) She could no longer work as a dancer after the car accident. (R. 60.) Then in 2007 she broke her hand and hurt her neck on a fair ride. (R. 60, 78.) Plaintiff last worked in 2013 when she moved to Bronson, Florida. (R. 63.) After she moved she looked for housecleaning jobs that she could do a couple of days per week but was unsuccessful. Then in September 2014 Plaintiff was hit by a truck.

Plaintiff cannot work full time because she has to lay down often due to pain in her lower back and neck and in her arms, hands, and feet from arthritis. (R. 64.) Sometimes the lower back pain goes down her leg and

the neck pain causes migraines every day (R. 84.) Her pain upon waking is a seven or eight out of ten but then decreases to a five or six after she takes her medications. (R. 85.) She takes meloxicam and prednisone for rheumatoid arthritis and omeprazole for acid reflux. (R. 67–68.) The medications sometimes make her groggy at night. (R. 68.) The Prednisone also makes her back burn and worsens her bipolar disorder. (R. 68.) She was also diagnosed with gout in her right arm three years ago. (R. 70–71)

Plaintiff has always had depressed, hopeless feelings, but her physical problems have made her depression worse. (R. 88.)  She also gets mood swings every other day. (R. 90–91.) Now Plaintiff also has trouble focusing and concentrating and can only read a chapter of a book at a time. (R. 89.) Although her anxiety causes pain in her chest and sometimes makes her burst into tears, her anxiety is not too bad when she is on medication. (R. 88–89.)

Plaintiff can only sit for an hour before she has to lay flat for fifteen to twenty minutes. (R. 71.) She can stand for thirty to forty minutes before having to sit down or take a break. (R. 72.) Stairs also hurt her feet. (R. 72–73.) She has never been prescribed an assistive device for walking, however, aside from after an accident many years ago. (R. 73.)

During a typical day Plaintiff wakes up and stretches in bed, takes her medications, makes coffee, sits and drinks her coffee, and then tries to clean the house. (R. 75.) Cleaning takes a long time, however, because she can only clean for a couple of minutes before she has to lay down for a few minutes. Once she is done cleaning the kitchen she tries to vacuum the living room but has to take breaks. Then she tries to do laundry, which is difficult because she has to carry the clothes out to the clothesline several pieces at a time (R. 76.) When she is done cleaning she makes something simple for dinner and goes to bed. (R. 76, 80.) She showers on her own every other day (R. 76.) Plaintiff can also put on her own socks and shoes. (R. 73.)

Plaintiff is able to walk to her mailbox but then has to sit down before she can try to do anything else. (R. 72.) She can go grocery shopping but her son or someone else at the store carries things for her. (R. 78.) Nevertheless, she is able to pick up a gallon of milk and can frequently lift five pounds. (R. 70, 78.) When her gout flares up, however, she cannot lift anything. (R. 70–71) She does not have a driver's license so her neighbors drive her to the store. (R. 80.) She watches movies with her son and reads books but does not do anything with other people. (R. 82.) She has a hard

time dealing with other people because of her severe anxiety and panic attacks. (R. 73.)

**D.    The ALJ's Findings**

The ALJ determined that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2018. (R. 12.) She further determined that Plaintiff has not engaged in substantial gainful activity since August 15, 2014, the alleged onset date. The ALJ found that Plaintiff has the following severe impairments: (1) Bipolar I disorder; (2) General anxiety disorder; (3) A history of a panic disorder; (4) Disorders of the spine; (5) Arthralgia; (6) A history of PTSD; (7) A history of a major depressive disorder; and (8) A history of rheumatoid arthritis. At step three, the ALJ did not find that any of the impairments or combination of impairments met or medically equaled the severity of one of the listed impairments. (R. 13.)

At step four the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with additional limitations. (R. 15.) The ALJ further determined that Plaintiff is unable to perform past relevant work. (R.

22.)

At step five, however, based on Plaintiff's age, education, work experience, and RFC, and in reliance upon a vocational expert, the ALJ found there are jobs that exist in significant numbers in the national economy Plaintiff can perform. (R. 23.) Accordingly, the ALJ determined Plaintiff has not been under a disability from August 15, 2014, through the date of the ALJ's decision. (R. 24.)

## IV.  DISCUSSION

Plaintiff argues on appeal that (1) the ALJ erred the assessment of the opinions of Dr. Sacher, a treating physician, and (2) substantial evidence does not support the ALJ's RFC determination. (ECF No. 13.)

## A.    The ALJ properly evaluated Dr. Sacher's opinions.

 If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 416.927(d)(2). Nevertheless, the ALJ may discount the treating physician's opinion if good cause exists to do so. *Hillsman v. Bowen*, 804

F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the

opinion is "not bolstered by the evidence," the evidence "supports a

contrary finding," the opinion is "conclusory" or "so brief and conclusory

that it lacks persuasive weight," the opinion is "inconsistent with [the

treating physician's] own medical records," the statement "contains no

[supporting] clinical data or information," the opinion "is unsubstantiated by

any clinical or laboratory findings," or the opinion "is not accompanied by

objective medical evidence." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th

Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (citing

*Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)).

If an ALJ rejects a treating physician's opinion, she must give explicit,

adequate reasons for so doing, and failure to do so results in the opinion

being deemed accepted as true as a matter of law. *MacGregor v. Bowen*,

786 F.2d 1050, 1053 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837,

841 (11th Cir. 1992). The Commissioner's reasons for refusing to credit a

treating physician's opinion must be supported by substantial evidence.

*MacGregor*, 786 F.2d at 1054.

In this case, after reviewing Dr. Sacher's April 2016 opinions, the ALJ

concluded that the opinions were "not well supported by medically acceptable techniques and [are] inconsistent with the other substantial evidence in the record," and assigned little weight to the opinions. (R. 47.) The ALJ gave explicit, adequate reasons supported by substantial evidence for giving Dr. Sacher's opinions little weight.

In making this determination the ALJ relied upon Dr. Sacher's notes of examinations in September 2013, April 2014, July 2015, August 2015, and September 2015, all of which document that Plaintiff had full muscle strength. Dr. Scaher's notes documenting consistently that Plaintiff had full muscle strength during a two year period are completely at odds with Dr. Sacher's opinion that Plaintiff cannot lift more than five pounds. *See* §§ 404.1527(c)(4), 416.927(c)(4).

The ALJ also noted that various records document Plaintiff's full range of motion in her lower extremities. Despite the objective radiographic evidence, repeated findings that Plaintiff had a full range of motion in her lower extremities do not support Dr. Sacher's extreme opinion that Plaintiff can only sit or stand at will for one hour during an eight-hour workday. Notably, Plaintiff walked without an assistive device and admitted that she spends most of her day, albeit with occasional breaks, cleaning her entire

house.

In discounting Dr. Sacher's extreme opinion the ALJ also relied upon the fact that Plaintiff received relatively conservative treatment with Dr. Sacher and that Plaintiff only treated with Dr. Sacher for a short period of time. The records do not suggest that Plaintiff received injections while treating with Dr. Sacher or that Dr. Sacher—or any providers—ever recommended surgery. Instead, Plaintiff went to physical therapy for a brief period of time almost a year before beginning treatment with Dr. Sacher. Dr. Sacher predominantly treated Plaintiff with opiates and other prescription medications. Lastly, Dr. Sacher (as well as several other providers) consistently recommended that Plaintiff exercise daily, a recommendation completely at odds with Dr. Sacher's opinion that Plaintiff could not sit or stand for one hour a day.

For these reasons, good cause existed for the ALJ to discount Dr. Sacher's opinions.  The ALJ gave explicit and adequate reasons supported by substantial evidence for doing so. Accordingly, the Court concludes that the ALJ did not err in assigning little weight to Dr. Sacher's opinions.

**B.    Substantial evidence supports the ALJ's RFC determination.**

A claimant's RFC is the most a claimant can do, despite her

limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC is based,

not only on medical opinions, but also the ALJ's review of all relevant

evidence in the record. *Id.*; 20 C.F.R. §§ 404.1546, 416.946.

> The ALJ determined that Plaintiff has the RFC to perform light work,

> with the claimant capable of lifting up to 20 pounds
> occasionally, and lifting and carrying up to 10 pounds
> frequently. The claimant can stand and/or walk for six hours
> during the course of an eight-hour workday, and sit for up to six
> hours during the course of an eight-hour workday, with normal
> breaks. The claimant can occasionally balance, stoop, kneel,
> crouch, crawl, and climb ramps, stairs, ladders, ropes or
> scaffolds. The claimant can frequently engage in felling,
> handling of objects, which is defined as gross manipulation,
> and fingering of items, which is defined as fine manipulation,
> bilaterally. The claimant must avoid concentrated exposure to
> the use of moving machinery and unprotected heights. Work is
> limited to simple, routine and repetitive tasks performed in a
> work environment free of fast-paced production requirements
> involving only simple work-related decisions and routine
> workplace changes, with only occasional interaction with the
> public and co-workers, and only occasional supervision.

(R. 15.)

> Under SSR 83-10, "light work" is defined as:

> lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds. Even though the
> weight lifted in a particular light job may be very little, a job is in
> this category when it requires a good deal of walking or
> standing--the primary difference between sedentary and most
> light jobs. A job is also in this category when it involves sitting
> most of the time but with some pushing and pulling of arm-hand
> or leg-foot controls, which require greater exertion than in

> sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

Additionally, SSR 83-10 defines "frequent" as:

> occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

Substantial evidence supports the ALJ's determination that Plaintiff has the RFC to perform light work with additional limitations.

As an initial matter, the ALJ determined that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the objective medical evidence and other evidence of record. (ECF No. 16–17.)  Because Plaintiff has not challenged this determination she has waived any argument that the ALJ erred in this finding. *See Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999) (to preserve an issue for appeal, the party must raise the "specific

issue to the district court" so that the district court has "an opportunity to consider the issue and rule on it").

The ALJ then thoroughly discussed the substantial objective medical evidence that supported her RFC determination. *See Dyer v. Barnhart*, 395 F.3d 1206, 12111 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole."). A lack of medical reports evidencing exertional limitations suggests that a claimant's impairments may not be as limiting as alleged. *See Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) (finding that substantial evidence supported the ALJ's conclusion that plaintiff's impairments were not severe because there were no reports indicating exertional limitations).

Specifically, the ALJ noted Plaintiff's normal range of motion, normal muscle strength, and stability in all joints in September 2013 and April 2014. Foot and ankle x-rays in May 2014 revealed no fractures of dislocations. Emergency room imaging immediately after her accident in August 2014 was negative. Then, despite Dr. Cardello's August 2014

finding that Plaintiff had a reduced range of motion and diagnosis of cervical, thoracic, and lumbar strains, Plaintiff admitted in November 2014 that her pain was improving. Similarly, despite imaging in October 2014 that revealed herniations at C3-C4 and C4-C5 with neural foraminal narrowing, a subsequent examination in October 2015 found Plaintiff to have normal ranges of motion in her knees, hips, ankles, writs, and elbows, with 5/5 strength in all extremities. Examinations in January, February, and March 2016 further reflected that Plaintiff had normal range of motion in her extremities, thoracic spine, and hips and a range of motion "complete with age" in her cervical and lumbar spine.

On examination in August 2015 Plaintiff had normal manual dexterity, good coordination, normal standing balance and gait, and the ability to heel to toe walk and squat and rise. Shoulder x-rays in January 2016 revealed no acute osseous abnormalities. Plaintiff also repeatedly had intact motor skills. These objective medical findings support the ALJ's conclusion that Plaintiff has the functional capacity to perform light work in accordance with the limitations set forth in the RFC.

The ALJ also relied on opinion evidence in determining Plaintiff's RFC. *See* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1) (explaining that in

evaluating the intensity and persistence of a claimant's symptoms, the Commissioner considers all of the available evidence, including the "medical opinions of your treating source and other medical opinions").[3] Specifically, Dr. Harris concluded that Plaintiff is capable of a reduced range of light work, to which the ALJ gave significant weight. Nevertheless, in an abundance of caution, the ALJ assigned Plaintiff additional limitations.

Dr. Chodosh similarly opined that Plaintiff can stand, walk, sit, bend over at the waist, squat, kneel, lift, carry, and handle objects normally, to which the ALJ gave significant weight. These opinions fully support the ALJ's determination that Plaintiff can perform light work with additional limitations.

Dr. Tozzo-Julian also opined that Plaintiff would be able to learn new tasks if they are repetitive but that Plaintiff would have difficulty coping with changes in her routine and job stress and in getting along with others. The ALJ assigned Dr. Tozzo-Julian's opinion significant weight. Consistent with

---

[3] To the extent Plaintiff quotes Dr. Mahtre and Dr. Tozzo-Julian's opinions, Plaintiff does not argue that the ALJ erred in assessing those opinions. Plaintiff has therefore waived any issue pertaining to the weight assigned to those opinions. See Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999) (to preserve an issue for appeal, the party must raise the "specific issue to the district court" so that the district court has "an opportunity to consider the issue and rule on it").

this assessment the ALJ limited Plaintiff to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions and routine workplace changes and limited Plaintiff to only occasional interaction with the public and co-workers and only occasional supervision. Plaintiff does not challenge these opinions and has therefore waived any argument pertaining to the ALJ's assessment of the opinions.

In sum, contrary to Plaintiff's position, substantial evidence, including objective medical evidence and opinion evidence, fully supports the ALJ's RFC determination. Accordingly, the Commissioner's decision should be affirmed.

## V. RECOMMENDATION

In light of the foregoing it is **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** this 24th  day of May 2018.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**